## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

---

| | |
|---|---|
| AARON HALL, KATHERINE GLOD, and JEFFREY BINDER, on behalf of themselves and all others similarly situated, | Case No. |
| Plaintiff | **CLASS ACTION COMPLAINT** |
| vs | **JURY TRIAL DEMANDED** |
| TRIVEST PARTNERS L.P., TGIF POWER HOME INVESTOR, LLC, and WILLIAM JAYSON WALLER | |
| Defendants | |

---

Plaintiffs Aaron Hall, Katherine Glod, and Jeffrey Binder, by and through their attorneys, for their Class Action Complaint against Defendants Trivest Partners L.P., TGIF Power Home Investor, LLC, and William Jayson Waller, allege and state as follows:

### INTRODUCTION

1.      Plaintiffs, on behalf of themselves and all others similarly situated, bring this class action arising from Defendants' operation of an enterprise business that ostensibly provided sales and installation of home solar systems, but which was fundamentally an instrument of fraud and deception that predictably ended in bankruptcy.

2.      Power Home Solar LLC ("PHS," later known as Pink Energy, sometimes referred to herein as "PHS/PE")'s business model was to promise significant energy bill savings to potential customers, and then send poorly trained, unqualified salespeople to potential customers' homes to sell them wildly overpriced solar systems (the "Systems").

3. These Systems would be "designed" and installed by poorly trained, unqualified and unlicensed technicians, all but ensuring that the systems would not perform at even a significant fraction of what the company's agents represented.

4. In most instances, these nearly worthless solar Systems were financed through arrangements made by PHS/PE, leaving Plaintiffs and the putative class with lengthy, expensive monthly payment commitments with no meaningful corresponding reduction in their electric bills.

5. This "business model" was executed through a pattern of mail and wire fraud, executed by Defendants for their own financial gain.

6. Defendants used this scheme to enrich themselves personally, including Defendant Waller, who transformed himself into a cartoonish veneer of wealth and excess through his attempts to portray a successful businessman:



7. At the beginning of 2018, Defendant Trivest purchased a 25% share in PHS and took a hands-on role in managing all aspects of the business along with Defendant Waller, notably

including providing financial support for and participating in PHS's massive new advertising campaign.

8.      The multimillion-dollar advertising campaign was false, misleading, and fraudulent and enabled PHS/PE to grow exponentially, causing enormous harm to customers in 15 states.

9.      Plaintiffs and the putative Class have suffered extensive and devastating damages as a result of Defendants' racketeering and conspiracy as complained of herein.

## **PARTIES**

10.     Plaintiff Aaron Hall is an individual that is over 18 years old and a citizen of the State of Michigan.

11.      Plaintiff Katherine Glod is an individual that is over 18 years old and a citizen of the State of Michigan.

12.     Plaintiff Jeffrey Binder is an individual that is over 18 years old and a citizen of the State of Michigan.

13.     Defendant Trivest Partners L.P. is an unincorporated organization (limited partnership) organized under the laws of Florida with its principal place of business at 550 S. Dixie Highway, Suite 300, Coral Gables, Florida 33146. For purposes of CAFA jurisdiction, Trivest Partners L.P. is a citizen of Florida.[1]

14.     Defendant TGIF Power Home Investor, is an unincorporated organization (limited liability company) organized under the laws of Delaware with its principal place of business at

---

[1] The general partner of Trivest Partners L.P. is Trivest Partners, Inc., which is also organized under the laws of Florida with its principal place of business at 550 S. Dixie Highway, Suite 300, Coral Gables, Florida 33146. Plaintiffs are informed and believe that the limited partners of Trivest Partners L.P. are Jamie Elias, David Gershman, Jorge Gross Jr., Forest Wester, Russ Wilson and Steve Reynolds, all of whom are individuals and citizens of Florida.

550 S. Dixie Highway, Suite 300, Coral Gables, Florida 33146. For purposes of CAFA jurisdiction, TGIF Power Home Investor is a citizen of Delaware and Florida.

15.　Defendant William Jayson Waller is an individual and a citizen of North Carolina residing at 16520 Reinsch Davidson, NC 28036.

## JURISDICTION AND VENUE

16.　This Court has jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). CAFA jurisdiction is appropriate because there is diversity in citizenship between the parties, there are 100 or more Class Members, and the aggregate amount in controversy exceeds five million dollars ($5,000,000.00), exclusive of interest and costs.

17.　This Court also has jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs assert claims under the laws of the United States, namely the the Racketeer Influenced and Corrupt Organizations Act of 1970 18 U.S.C. § 1961, *et seq.*

18.　Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this District, and a substantial part of property that is the subject of the action is situated in this District.

19.　Venue is also proper pursuant to 18 U.S.C. § 1965. One or more Defendants resides, is found, has an agent, and/or transacts their affairs in this district. Specifically, Defendant Waller maintains a home in Birmingham, Michigan (in the name of his wife Elizabeth) and Defendants operated their scheme through, among other places, Power Home Solar/Pink Energy's office located in this district.

## GENERAL ALLEGATIONS

20.　Defendant Waller founded Defendant Power Home Solar, LLC ("PHS") in 2014, becoming its CEO and at all times remaining one of its largest shareholders (if at any time he was not its largest).

21.     PHS was created to sell residential solar systems through in-home sales presentations.

22.     PHS sold home solar systems at significantly higher costs than many of its competitors.

23.     Defendant Waller personally designed PHS's sales practices, and the training materials and procedures that implemented them.

24.     PHS used internet, broadcast, billboard, print, and other advertising heavily focused on energy savings to get customers to make appointments with its salespeople.

25.     PHS's sales practices were heavily focused on closing sales on the first in person visit by obtaining signatures from prospective clients, in many cases on tablet devices that prevented customers from obtaining a proper view of the documents that they were purportedly signing.

26.     PHS's salespeople, who generally had as little as two days of training, were trained and incentivized never to leave a customer's house without a firm "yes" or "no," in other words to close the sale on the first visit or not close at all.

27.     These sales tactics were necessitated by the fact that any customer who engaged in price comparison would almost certainly decide against doing business with PHS due to its inferior prices and, later, horrific reputation amongst its customers.

28.     Industry standards require that home solar systems be both designed and installed by professionals certified by NABCEP, the North American Board of Certified Energy Practitioners.

29.     Proper training, including NABCEP certifications (issued separately for designers and installers), is essential because every home solar system is unique. The energy needs of the home, the amount of available sunlight, and the direction and pitch of the roof or other surfaces

are all essential considerations in determining the number, location, direction, and configuration of solar panels – if a home is even a proper candidate for solar energy.

30.     PHS not only did not require NABCEP certification of its design and installation employees, it disregarded the necessary training and certification entirely – in favor of minimal two day training programs designed by Defendant Waller.

31.     PHS sent poorly trained salespeople into potential customers' homes in the role of designers, purportedly aided minimally by an offsite "design team," (which would nearly instantly provide "plans" for solar installations) and utilized completely unqualified installers, ensuring that no qualified person ever laid eyes on a customer's home or hands on their system.

32.     PHS applied a uniform approach to selling its Systems, which was based on deceptive practices, untrue and materially misleading statements, and patently false advertising. Defendant Waller was personally responsible for both the development and administration of these intentionally misleading training techniques, and thus was an active proponent of the deceptive practices and untrue/misleading statements which were propounded through the mails and wires.

33.     For example, PHS sales staff were trained to tell potential customers that they needed to photograph their fuse panels as a ruse to gain entry to their homes, despite having no legitimate need to view the panels.

34.     By his own admission, Jayson Waller "started running the sales department and training reps myself."[2]

35.     These deceitful and aggressive sales tactics included scripted presentations and promotional materials, such as Pink Energy's website, pamphlets, and brochures.

---

[2] *Jayson Waller of POWERHOME SOLAR: 5 Things I Wish Someone Told Me Before Became a Founder and CEO*, Candice Georgiadis, Medium.com, https://medium.com/authority-magazine/jayson-waller-of-powerhome-solar-5-things-i-wish-someone-told-me-before-became-a-founder-and-ceo-7eee15ea1b44 (last accessed October 11, 2022).

36.     PHS made affirmative yet false representations to the Plaintiffs and Class that its Systems would reduce electricity bills by 70-90% and, in most instances, that they would receive a government rebate check to cover part or all of the System's purchase cost.

37.     PHS's training materials teach its salespeople that "this is a financial decision for the client… [y]ou must keep this in your focus, everything is about financial return."

38.     The entire sales process, step-by-step was built around the promise that customers would save money overall by investing in a System and lowering their electric bills.

39.     Sales representatives, relying on and pursuant to the training and promotional materials provided by PHS, falsely informed customers during the sales presentation that System installation would reduce their electric bill to little cost or zero, or in some cases, that the customer would even receive a rebate for the energy they produced for their utility provider.

40.     Sales staff was taught to ask "Mr. Client, what is your solar budget? Like how much do you spend on electricity?"

41.     While no qualified designer had ever looked at the customer's home, salespeople were trained to claim that "[w]e have designed a solar system properly that is going to work for you with a great financial decision this is going to be today and into the future."

42.     PHS's training materials further told salespeople to promise "your installation is going to be installed correctly 100%" and that "other companies just want to sell you a system. We want to sell you a system that will generate the most amount of power."

43.     PHS's training materials taught salespeople to have customers finance the total cost of the system with a promise that they would receive a tax credit which they could use to pay the loan down. An overwhelming number of its customers did not qualify for and/or receive any such credit.

44.     The training materials also taught salespeople to tell customers "congratulations, you are going to eliminate [a specific percentage] of your electricity bill with the money that your new solar system that you now own will save you each month" which, they promised, "is going to save you a lot of money over time."

45.     PHS also represented that clients would receive monitoring of the System for at least 25 years, meaning that the company had access to the extent to which customers Systems were functioning.

46.     PHS also represented that the Systems would function to provide electricity during power outages, marketing the System as a reliable backup energy option.

47.     The marketing materials provided to customers at home appointments repeatedly reiterated that the System would allow them to save money, and do so immediately.

48.     The materials promised explicitly that "[y]our new, dramatically lower utility bill plus your solar payments will be less than your old electric bill and saving will accumulate quickly over the years, especially as utility rates continue to soar."

49.     The Systems involve solar panels, power inverters, and batteries, as well as wiring to connect those components.

50.     System components are installed on the interior and exterior areas of consumers' homes, such as rooftops and attics.

51.     A group of solar panels is known as an "array." It is of paramount importance that an array face in a very specific direction, typically to the south-southeast for most American homes, in order for the system to properly generate power.

52.     The design, arrangement, and installation of a home solar System must be performed by qualified experts if the System is to have any chance of functioning properly.

53.     PHS's business model completely ignored the proper design, arrangement, and installation of the Systems purchased by Plaintiffs and the Class, meaning that contrary to its promises to save customers money, it was burdening them with expensive, ill-functioning Systems instead.

### Defendant Waller

54.     Defendant Waller utilized the PHS/PE scam to enrich himself personally and create the persona of a wildly successful businessperson.

55.     Waller authored a book touting his business success entitled "Own Your Power: No Excuses, No Bullsh*t. The Time is Now[,]" published a similar podcast called "True Underdog," and routinely posed in publications and social media in supercars, exotic fur coats, and expensive jewelry.

56.     Waller bragged to one Michigan publication about his watch collection, which he claimed included a diamond-encrusted Audemars Piguet, which would have been worth hundreds of thousands or millions of dollars.

57.     Waller lived like a man whose fortune had an expiration date, because it did. He knew that his house of cards would eventually collapse, as it now has.

58.     In the October 13, 2022, episode of his True Underdog podcast, entitled "#Powerplay: You Can't Do It On Your Own," Waller described his approach to motivating a sales force and growing a business, saying that he believed that the lowest 20% of performers should be let go each month. This approach illustrates the pressure exerted on salespeople to meet targets, using any means necessary to close the deal.

59.     In the same episode, Waller describes when he realized he needed to put his own ego to the side and seek private equity investment in order for PHS/PE to expand and be as profitable as possible.

60.     Waller personally conducted, controlled, and directed the fraud carried out by PHS/PE for purposes of his own enrichment, amassing the trappings of a significant personal fortune while defrauding trusting homeowners across the country out funds they often had to borrow under lengthy repayment terms.

61.     Waller committed countless acts of mail and wire fraud through PHS/PE by causing it to send out false, misleading, and fraudulent advertisements, communications, training materials, and instructions through the mails and wires (by internet, telephone, and/or fax) as alleged herein.

**Defendants Trivest Partners L.P. and TGIF Power Home Investor, LLC**

62.     On or about January 1, 2018, Trivest Partners L.P. ("Trivest") purchased an approximate 25% share in PHS through TGIF Power Home Investor, LLC ("TGIF"), infusing PHS with at least $15 million.

63.     At the time of Trivest's investment, Trivest performed substantial due diligence involving widespread access to PHS' business records, both for purposes of determining whether to make its substantial investment and in order to learn where it could create efficiencies after the acquisition in order to profit therefrom.

64.     According to a TGIF Investment Strategy Overview, the general investment strategy for TGIF was to establish, inter alia, "performance management," "standardized reporting," and "organic growth," as well as a "CEO conference."[3]

65.     Trivest's investment goal was to exit PHS when the "company [is] positioned for a premium valuation," as it is at this point they can reap the highest return on their investment. Their investment strategy marketing material boasts that they have "overseen more than 50 sale processes." *Id*.

---

[3]  https://www.trivest.com/wp-content/uploads/2021/11/TGIF_Overview.pdf (last visited October 22, 2022)

66.    As reported by Inc.com, Trivest's investment provided PHS with "the capital required to hire more employees, increase its marketing budget, and buy more solar panels. 'Solar construction is a cash-flow business,' says Waller. 'If you don't have the cash, you can't grow.'"[4]

67.    As Inc.com reported, Trivest took a hands-on approach to managing PHS in the wake of its investment. "[Trivest's] impact went beyond just more spending power. Trivest hebted Powerhome … revamp the way it created and measured internal objectives. The firm's executives worked with the Powerhome team to optimize the customer journey from beginning to end, starting with the moment a potential client sees an advertisement and all the way through post-installation follow-ups. In the four years since, Powerhome has expanded its business from four states to 15." *Id*.

68.    Following the merger, Waller communicated with Trivest "daily" regarding the operation of the business. *Id*.

69.    Trivest's capital infusion and business involvement raised PHS' annual revenue from approximately $40 million to in excess of $700 million, and an over $1 billion valuation, all on the backs of deceived customers.

70.    Waller admits that without Trivest's involvement "we couldn't have grown as fast as we have." *Id*. Despite being founded in 2014, PHS/PE did not feature a traditional corporate structure until after Trivest's involvement began in 2018, after which time a CMO, CFO, and various other leadership positions were incorporated into the structure of the company.

71.    Trivest, including but not exclusively through its subsidiary TGIF, participated in the management of PHS's marketing, sales, and business as a whole.

---

[4] https://www.inc.com/kevin-j-ryan/powerhome-trivest-solar-private-equity-growth.html (last visited Oct. 15, 2022).

72.     Trivest and TGIF committed countless acts of mail and wire fraud through PHS/PE by causing it to send out false, misleading, and fraudulent advertisements, communications, training materials, and instructions through the mails and wires (by internet, telephone, and/or fax) as alleged herein.

### PHS/PE's Relentless Fraudulent Advertising

73.     Immediately following Trivest's investment in PHS, PHS utilized the capital injection and leveraged Trivest-organized lines of credit to launch a massive advertising campaign designed to fuel rapid growth.

74.     PHS/PE used internet social media, largely Meta's Facebook platform, to disseminate so many false, misleading, and fraudulent advertisements that in its recent bankruptcy filing it reported owing more than $4 million to Meta.

75.     These advertisement campaigns were conceived, designed, and created by Defendant Waller with the direct involvement and participation of Trivest and TGIF, which provided funding, guidance, and oversight for the campaign, among other things.

76.     PHS/PE posted its advertisements from its own accounts, or from accounts designed to look like separate entities in the solar industry, or solar interest groups.

77.     In nearly all instances, the advertisements promised overall savings on electricity, tax credits, and other fraudulent inducements to do business with PHS/PE.

78.     Examples of the company's thousands of misleading advertisements include:

































79.     These advertisements included statements such as that the company would "pay

you to save thousands of dollars"; "start saving money on your very first electric bill"; "qualified

homeowners can save thousands on their electric bills" ; "this 2021 [also run as 2020] solar program could lower your electric bills by up to 87% right now" ;  "solar allows you to OWN your power and reduce your energy bill to save thousands with reduced energy costs" ; an advertisement from "cutyourpowerbill.us" alerting customers that "if you pay over $100/month for electricity, you're going to want to read this" ; and advertisements from "the cut your power bill event, sponsored by Power Home Solar[.]"

80.     PHS/PE's advertising often included Defendant Waller's personal tagline, which he used to market himself and his book and podcast, "Own Your Power[,]" which was contrasted with "renting" or purchasing power, an obvious claim that people who purchased PHS/PE's Systems would no longer need to purchase most or all of their electricity from utility companies.

81.     PHS/PE repeated its fraudulent claims about its systems on its website, such as claiming "there's no doubt about it, solar-powered electricity is a cost-saving energy alternative" and advertising "the ultimate return on investment."

82.     This continued uninterrupted throughout the class period. Up until PHS/PE ceased business operations, its website continued to encourage potential customers to "cut electric costs with solar."

## Plaintiffs' Systems, Defects, and Financing

83.     The Plaintiffs and Class are consumers who reasonably and justifiably relied on PHS's representations when they decided to purchase their Systems.

84.     The Plaintiffs and Class relied specifically on the PHS's representations that the Systems would reduce their electricity bills by 70-90% and provide electricity during power outages.

85.     Given the substantial cost of the Systems, Plaintiffs and the Class executed loans and/or credit sales contracts or made other arrangements to finance the purchases of their Systems.

86.     PHS connected customers with lenders who would fund the purchases, advertising "flexible ways for consumers to pay for a wide range of sustainable products, including solar panels, [and] battery storage."[5]

87.     It was a standardized practice for systems to be financed through PHS's specifically chosen loan providers.

88.     In a style nearly identical to that utilized during the sales presentation, PHS sales reps were trained to hurriedly and aggressively present loan options and pressure the potential customer into signing.

89.     The loan agreements were presented in the same way that the sales agreements were, with the PHS sales representative exercising sole control over the pace of review on their tablet.

90.     Plaintiff Aaron Hall purchased his System on June 21, 2019 for $34,300, which was financed by a loan/credit sales contract arranged by Defendant. Plaintiff Hall was deceived by PHS/PE's misrepresentations about the expected production and functionality of his System, which has not provided any significant benefit whatsoever despite costing tens of thousands of dollars.

91.     Plaintiff Katherine Glod purchased her System on October 23, 2019 for $66,325, which was financed by a loan/credit sales contract arranged by Defendant. Plaintiff Hall was deceived by PHS/PE's misrepresentations about the expected production and functionality of her System, which has not provided any significant benefit whatsoever, despite costing tens of thousands of dollars.

---

[5] https://goodleap.com/about-us/ (accessed Oct. 5, 2022).

92.     Plaintiff Jeffrey Binder purchased his System on June 21, 2019 for $48,885, which was financed by a loan/credit sales contract arranged by Defendant. Plaintiff Hall was deceived by PHS/PE's misrepresentations about the expected production and functionality of his System, which has not provided any significant benefit whatsoever, despite costing tens of thousands of dollars.

93.     After the Plaintiffs' and Class' Contracts were executed and their systems were installed, it quickly became apparent that the systems were not functioning as they were supposed to.

94.     The Plaintiffs' and Class' electricity bills were not reduced in any amount near 70-90%, if at all, and in some instances their electricity bills actually increased.

95.     PHS/PE and Defendants knew that customers' electric bills were not being reduced by anywhere near the promised numbers, because it had access to real-time monitoring information about their Systems' production.

96.     The Systems did not provide electricity during power outages, or did so sporadically.

97.     When the Plaintiffs and Class complained to PHS about these issues, they were informed that the problems were remediable and would be resolved.

98.     In actuality, the systems cannot be fixed because they were haphazardly and uselessly designed and installed in the first instance.

99.     The systems were installed by persons lacking sufficient knowledge to perform such installations.

100.    However, it took months or years for the Plaintiffs and Class to realize this given PHS's assurances that the Systems could be fixed to operate as originally advertised.

22

101.   The Plaintiffs and Class have made, and continue to make, regular and substantial payments for these defective Systems. In many instances, the term of loans agreed to by Plaintiffs and the Class span decades.

102.   Due to the Systems not performing, Plaintiffs and the Class are required to make loan payments on the systems in addition to paying their largely unchanged energy bills.

103.   The Plaintiffs and Class have suffered extensive losses as a result of Defendants' fraudulent scheme of marketing and promising functioning solar Systems that would reduce their energy bills while selling a product that cannot deliver on those representations.

104.   Defendants are liable to the Plaintiffs and Class for the damages they have suffered as a result of Defendants' scheme.

### The Fraudulent Concealment

105.   PHS/PE, in concert with Defendants, took great efforts to conceal the fact that Plaintiffs and the putative Class had defective systems that would never actually work as promised.

106.   First, in late 2021 and early 2022, PHS rebranded as Pink Energy, which may have given it some distance from the mounting concerns about its Systems.

107.   PHS/PE advertised the name change as a rebranding for purposes of broadening the company's offerings. In reality, it was the result of settling a trademark infringement lawsuit brought against PHS/PE for the use of its prior name.

108.   PHS/PE issued numerous e-mails and public statements, most of which were authored by Defendant Waller personally, indicating that the problems its customers were facing were caused by problems with a particular component in the systems – "SnapRS" made by Generac.

109.   For example, in a September 12, 2022 press release, PHS/PE blamed Generac for its own need to lay off 1100 employees in 2022.

110.    PHS/PE even filed a lawsuit blaming Generac for the problems with its customers systems.

111.    The lawsuit, *Power Home Solar, LLC v. Generac Power Systems, Inc*., Case No. 6:22-cv-00043, filed in the United States District Court for the Western District of Virginia, blames substantially all of PHS/PE's System failures on Generac.

112.    While Generac has acknowledged some problems with the components, this issue is a red herring for PHS/PE. These problems were remediable and Generac could, did, and continues to fix them, but PHS/PE blamed the problem for completely unrelated issues that cannot be fixed because of their own faulty sales, design, and installation.

113.    Only a subset of PHS/PE's customers were impacted by the components, and faulty components cannot compromise a system that cannot function as intended in the first place.

114.    Because of PHS/PE's repeated false assertions regarding Generac- which include going so far as to blame Generac for PHS/PE's bankruptcy, Plaintiffs and Class members were prevented from learning the truth about their defective systems and that they had legal claims against Defendants.

115.    In response, Generac has largely blamed PHS/PE's faulty installations, and stated "[b]y their inflammatory public statements and the lawsuit, we believe Pink Energy may be hoping to distract customers from the many complaints and allegations that reportedly have been leveled against them regarding poor installation and service, as well as public accounts of dubious marketing claims and sales tactics[.]"[6]

## CLASS ALLEGATIONS

### A.   Definition of the Class

---

[6] https://renewablesnow.com/news/update-generac-suggests-pink-energy-customers-suffer-from-poor-installation-797760/ (last visited October 21, 2022).

116.   Plaintiffs bring this action individually and on behalf of all persons that the Court may determine appropriate for class certification, pursuant to Fed. R. Civ. P. 23 (the "Class" or "Class Members"). Plaintiffs seek to represent a Class of persons preliminarily defined as:

**All persons in the United States who purchased a home solar system from Power Home Solar, LLC (including d/b/a Pink Energy) at any time since January 1, 2018.**

This definition is subject to modification as discovery discloses further information. Plaintiffs reserve the right to propose one or more sub-classes if discovery reveals that such subclasses are appropriate.

117.   This case is properly maintainable as a class action pursuant to and in accordance with Fed. R. Civ. P. 23 in that:

a)   The Class, which includes thousands of members, is so numerous that joinder of all Class Members is impracticable;

b)   There are substantial questions of law and fact common to the Class, including those set forth in greater particularity herein;

c)   Questions of law and fact, such as those enumerated below, which are common to the Class, predominate over any questions of law or fact affecting only individual members of the Class;

d)   The claims of the representative party are typical of the claims of the Class;

e)   A class action is superior to any other type of action for the fair and efficient adjudication of the controversy;

f)   The relief sought in this class action will effectively and efficiently provide relief to all members of the Class;

g)   The prosecution of separate lawsuits by Class Members would risk inconsistent or varying adjudications. Class-wide adjudication of these claims is, therefore, appropriate.

h)   There are no unusual difficulties foreseen in the management of this class action; and

i)   Plaintiffs, whose claims are typical of those of the Class, through their experienced counsel, will zealously and adequately represent the Class.

**B.   Numerosity**

118.   There are thousands of individuals who are members of the proposed Class. Over 1,000 Class Members have already contacted Plaintiff's counsel regarding their claims. Accordingly, the Class Members are so numerous that joinder of all parties is clearly impracticable.

**C.   Commonality**

119.   Numerous common questions of law and fact predominate over any questions affecting individual Class Members including, but not limited to, the following:

a)   Whether an enterprise existed for purposes of RICO;

b)   Whether the enterprise affected interstate commerce;

c)   Whether each Defendant was associated with or employed by the enterprise;

d)   Whether each Defendant participated in the enterprise;

e)   Whether each Defendant conducted or participated in the conduct of the enterprise;

f)   Whether such conduct of the enterprise was through racketeering activity;

g)   Whether such racketeering activity constituted a pattern;

h)   Whether each Defendant committed, through the enterprise, at least two acts of mail or write fraud;

i)   Whether representations that purchasing a System from PHS/PE would save customers money were false, misleading, and/or fraudulent;

j)   Whether Plaintiffs were injured in their business or property by reason of Defendants' RICO violations.

**D.   Typicality**

120.   Plaintiffs have the same interests in this matter as all other members of the Class and their claims are typical of the claims of all members of the Class. If brought and prosecuted individually, the claims of each Class Member would require proof of substantially the same material and substantive facts, utilize the same complex evidence (e.g. expert testimony), rely upon the same legal theories, and seek the same type of relief.

121.   The claims of the Plaintiffs and other Class Members have a common cause and their damages are of the same type. The claims originate from the fraudulent and misleading sales practices of PHS/PE.

**E.   Adequacy of Representation**

122.   Plaintiffs' claims are sufficiently aligned with the interests of the absent Class Members to ensure that the Class' claims will be prosecuted with diligence and care by Plaintiffs as representatives of the Class. Plaintiffs will fairly and adequately represent the interests of the Class and they do not have interests adverse to the Class.

123.   Plaintiffs have retained the services of counsel who are experienced in complex class action litigation. Plaintiff's counsel will vigorously prosecute this action and will otherwise protect and fairly and adequately represent the Plaintiffs and all absent Class Members.

**F.   Class Treatment is the Superior Method of Adjudication**

124.   A class action is superior to other methods for the fair and efficient adjudication of the controversies raised in this Complaint because:

a)   Individual claims by the Class Members would be impracticable as the costs of pursuit would likely exceed what any one Class Member has at stake;

b)   Individual claims by Class Members would create a risk of inconsistent or varying adjudications, which would present the Defendant with incompatible standards of conduct;

c)   Individual claims by individual Class Members would create a risk of adjudications which would, as a practical matter, be dispositive of the interests of other

individuals who are not parties to the adjudications, or substantially impair or impede their ability to protect and pursue their interests;

d) Little or no individual litigation has been commenced over the controversies alleged in this Complaint and individual Class Members are unlikely to have an interest in separately prosecuting and controlling individual actions;

e) In view of the complexity of the issues and the expenses of litigation, the separate claims of individual Class Members are likely insufficient in amount to support the costs of filing and litigating separate actions;

f) The Plaintiffs seek relief relating to the Defendant's common actions and the equitable relief sought would commonly benefit the Class as a whole;

g) The concentration of litigation of these claims in one action will achieve efficiency and promote judicial economy; and

h) The proposed class action is manageable.

## CAUSE OF ACTION I

**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**
**18 U.S.C. §§ 1962(a) & (c)**
**All Plaintiffs Against All Defendants**

125. Plaintiff restates all allegations of this Complaint as if fully restated herein.

126. Plaintiffs bring this claim individually and on behalf of all other Class members.

127. Each Defendant is a "person" under 18 U.S.C. § 1961(3) because it is an entity capable of holding, and does hold, "a legal or beneficial interest in property."

128. Section 1962(a) makes it "unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of Section 2, Title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(a).

28

129.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

130.    Section 1962(d) makes it unlawful for "any person to conspire to violate" §§ 1962(a) and (c), among other provisions. 18 U.S.C. § 1962(d).

131.    Power Home Solar, LLC (a/k/a Pink Energy) was an enterprise within the meaning of RICO.

132.    The enterprise affected interstate commerce, as at its peak, PHS/PE marketed and sold solar panels in 15 states

133.    The enterprise was characterized by PHS/PE's fraudulent and misleading sales and business practices, which enabled the enterprise to gain market share and profit immensely.

134.    The enterprise was used to enhance the fortunes of all Defendants.

135.    Defendants were associated with an illegal enterprise, and conspired, conducted, and participated in that enterprise's affairs, through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mail and wire facilities to execute a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343, all in violations of RICO, 18 U.S.C. §§ 1962(a), (c)-(d). These acts, committed by interstate wire and through the mails, include: (1) the creation, design, approval, and delivery of misleading advertising materials; (2) receiving profit distributions flowing directly from customer payments for fraudulently sold, ill-functioning home solar systems which were misrepresented to their buyers. PHS/PE functioned in numerous states, delivering  advertisements created, designed, approved, and delivered by Defendants across state lines through the mails and wires, and receiving payments across state lines through the mails and wires.

29

136.    Defendants profited from the enterprise, and Plaintiffs and Class members suffered injury to their property because the enterprise caused them to pay enormous sums of money for home solar systems that did not work anywhere near as well as they were supposed to, often in long-term monthly installment contracts which had to be paid alongside energy bills that did not materially decrease. Defendants used the proceeds from this scheme to advance the scheme by, among other things, funding and operating their marketing and sales efforts through the use of the mails and interstate wires to continue growing the enterprise, causing further injury to members of the Class.

137.    Defendants conspired to defraud Plaintiffs and the Class, who purchased home solar systems from PHS/PE under the belief that they would be able to save money over time.

138.    As a result of this fraud, Plaintiffs and the Class received faulty equipment, little to no energy savings, or both, in addition to overwhelming loan payments for inoperable solar systems. Defendant PHS/PE used these ill-gotten revenues to expand their operations and continue spreading their scheme throughout the United States, while PHS/PE's significantly increased valuation and soaring profits led to substantial financial gain for both Waller personally and Trivest professionally.

139.    Trivest touted the revenue and valuation success of PHS/PE to secure future investments in their fund.

140.    The corporate structure, leadership, and operations shifted after Trivest's investment and guidance were implemented, including through more aggressive and volume-focused sales tactics.

141.    Overall, the scheme spanned a substantial amount of time, at least from Trivest's investment in January 2018 until PHS/PE shuttered operations and declared bankruptcy in October 2022.

142.    Defendants conducted and participated in the affairs of PHS/PE Enterprise through a pattern of racketeering activity that consisted of numerous and repeated violations of the federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343. Defendant's countless advertisements and training materials demonstrate the continuity of Defendants' and the enterprise's conduct over multiple years and on an ongoing basis, representing numerous separate and distinct examples of mail and wire fraud.

143.    By using a systematic scheme to fraudulently advertise and sell the Systems, the members of the enterprise used the United States Mail and interstate electronic wires and thus committed hundreds of thousands of separate acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. These acts and transactions were not isolated but were related and part of the same fraudulent scheme, were directed at Plaintiffs and each Class member; were committed in the same or similar manner; and resulted from the same or similar fraudulent and improper intent by Defendants.

144.    Defendants and the enterprise received payments and/or value from the fraudulently sold Systems through interstate wire facilities. These wirings are part of the pattern of racketeering activity in which Defendants engaged. In furtherance of the scheme, Defendants committed thousands of separate mail and wire fraud violations on a monthly basis over more than four years by transmitting their fraudulent advertisements and training materials, each one constituting its own separate and distinct predicate act, through the United States Mail and interstate wire facilities. Each of these violations was related because they effectuated the common purpose of the enterprise and its participants of defrauding Plaintiffs and the Class by fraudulently selling the Systems. Defendants also transferred between and among themselves, and received

from Plaintiffs and the Class, monetary proceeds of the enterprise, in furtherance of their scheme to defraud Plaintiffs and Class members in violation of 18 U.S.C. § 1343.

145.   These related acts had the same or similar purpose, results, participants, victims, and methods of commission, and are otherwise related by distinguishing characteristics which are not isolated events.

146.   As a result of Defendants' acts as alleged herein, Plaintiffs and the putative Class were injured in their business and/or property, in amounts including the price of their Systems and all associated financing and accommodation costs.

**CAUSE OF ACTION II**
**CONSPIRACY TO VIOLATE RACKATEER INFLUENCED AND CORRUPT**
**ORGANIZATIONS ACT**
**18 U.S.C. § 1962 (d)**
**All Plaintiffs Against All Defendants**

147.   Plaintiffs restate all allegations of this Complaint as if fully restated herein.

148.   Defendants agreed to engage in a pattern of fraudulent and misleading sales tactics and advertising for the significant financial gain of both as the means to accomplish their overall objective.

149.   The overall objective of the conspiracy was to maximize to the greatest extent possible the financial gains of each Defendant through a pattern of fraud on unsuspecting and vulnerable solar customers.

150.   Defendants' agreement to act fraudulently for the purpose of monetary gain is evidenced by the substantial investment in PHS/PE by Trivest/TGIF and the subsequent changes in PHS/PE's structure and practices to better perpetrate their fraud.

151.   Defendants communicated on a regular basis to coordinate their acts in furtherance of their fraudulent scheme.

152.    Defendants utilized the mail and wires in their fraudulent pursuits on occasions too numerous to list herein as evidenced by the widespread fraudulent advertisement and training materials distributed thereby.

153.    Overall, Defendants agreed to engage in fraudulent acts in for the purpose of maximizing their monetary gain from PHS/PE's business and committed numerous predicate acts of mail and wire fraud in furtherance of this agreed-upon purpose.

154.    As a result of Defendants' acts as alleged herein, Plaintiffs and the putative Class were injured in their business and/or property, in amounts including the price of their Systems and all associated financing and accommodation costs.

**CAUSE OF ACTION III**
**VIOLATIONS OF THE MICHIGAN CONSUMER PROTECTION ACT**
**All Plaintiffs Against All Defendants**

155.    Plaintiffs restate all allegations of this Complaint as if fully restated herein.

156.    Defendants engaged in commerce, as they marketed and sold solar panel systems. These systems were intended for household purposes, including producing and storing energy.

157.    Defendants engaged in unfair, unconscionable, and/or deceptive methods, acts, and/or practices in the conduct of trade and commerce.

158.    Through their campaign of false advertising and deliberately misleading sales pitches, Defendants committed violations of the Michigan Consumer Protection Act including, but not limited to:

a.    Advertising or representing goods or services with intent not to dispose of those goods or services as advertised or represented;

b.    Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;

33

    c.   Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner;

    d.   Charging the consumer a price that is grossly in excess of the price;

    e.   Causing coercion or duress as the result of the time and nature of a sales presentation; and

    f.   Representing that a consumer will receive a rebate, discount, or other benefit as an inducement for entering into a transaction, if the benefit is contingent on an event to occur subsequent to the consummation of the transaction.

159.   The conduct Defendants engaged in was not authorized by law, generally or specifically. The sale of residential solar systems is not regulated in Michigan.

160.   The fraud committed against the Class consumers resulted in their substantial monetary loss, including payment for solar systems that either did not work at all or did not work/produce benefits as advertised.

161.   As a result of Defendants' acts as alleged herein, Plaintiffs and the putative Class were injured in their business and/or property, in amounts including the price of their Systems and all associated financing and accommodation costs.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff, individually and on behalf of the proposed Class, prays for judgment as follows:

    A.   Certification of the proposed Class by order pursuant to Fed. R. Civ. P. 23;

    B.   Designation of the Plaintiff as representative of the proposed Class and designation of his counsel as Class counsel;

    C.   Judgment in favor of the Plaintiffs and Class Members as against the Defendants;

    D.   An award to each Plaintiff and Class Member for actual damages, trebled as required under RICO;

E.   An award of attorneys' fees and costs, including pre- and post-judgement interest;

F.   Such further relief that this Honorable Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury of all issues so triable.

Date: November 13, 2022                    Respectfully submitted,

s/  Nicholas A. Coulson_____
Steven D. Liddle
Nicholas A. Coulson
Lance Spitzig
**LIDDLE SHEETS COULSON P.C.**
975 East Jefferson Avenue
Detroit, MI 48207-3101
T: (313) 392-0015
E: sliddle@lsccounsel.com
E: ncoulson@lsccounsel.com

*Attorneys for Plaintiffs and the Putative Class*