UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AARON HALL, *et al.*,                                    Case No. 22-12743

     Plaintiffs,                                        F. Kay Behm
v.                                                      United States District Judge

TRIVEST PARTNERS, L.P., *et al.*,

     Defendants.
_____ /

**OPINION AND ORDER GRANTING IN PART AND DENYING
IN PART MOTION TO DISMISS THE COMPLAINT (ECF No. 17)**

**I.      PROCEDURAL HISTORY**

Plaintiffs filed this RICO action on November 12, 2022.  (ECF No. 1).

Defendants Trivest Partners L.P. and TGIF Power Home Investor, LLC filed a

motion to dismiss the complaint on February 15, 2023.  (ECF No. 17).  The matter

is fully briefed.  (ECF Nos. 18, 20).  Pursuant to notice, the court held a hearing via

video teleconference on August 2, 2023.  (ECF No. 21).  For the reasons set forth

below, the court **DENIES** the motion to dismiss in its entirety, except that

Plaintiffs' claim under § 1962(a) is **DISMISSED**.

**II.     FACTUAL BACKGROUND**

Plaintiffs filed this action against Defendants Trivest, TGIF, and William

Jayson Waller.  (ECF No. 1).  Plaintiffs allege that the three Defendants violated

RICO through a pattern of racketeering activity involving their conduct with Power

Home Solar, LLC (PHS), also known as Pink Energy (PE). *Id*. The Complaint

outlines an allegedly fraudulent scheme designed to lure consumers into

purchasing home solar systems to be designed, installed, and sold by PHS/PE, and

which was carried out by Defendants through multiple uses of the mail and wires.

*Id*. The scheme included numerous false and misleading advertisements, training

materials, and other communications designed to achieve its goals.

Trivest is a private investment limited partnership organized under the laws

of Florida with its principal place of business in Florida. (ECF No. 1, ¶ 13). TGIF is

a limited liability company organized under the laws of Delaware with its principal

place of business in Florida. *Id*. at ¶ 4.[1] Plaintiffs allege that Trivest, through TGIF,

purchased an approximately 25% stake in PHS and that Trivest took a "hands-on

role in managing all aspects of the business along with Defendant Waller." (ECF

No. 1, ¶¶ 7, 62). The Complaint alleges that this "hands-on role" included

providing financial support for and participating in PHS's massive advertising

campaign. *Id*. at ¶ 7; see also *id.* at ¶ 71 ("Trivest, including but not exclusively

---

[1] According to Defendants, TGIF is part of the Trivest Growth Investment Fund. See https://www.trivest.com/wp-content/uploads/2021/11/TGIF_Overview.pdf. The fund makes non-control, minority investments in fast-growing founder- and family-owned businesses. *Id*.

through its subsidiary TGIF, participated in the management of PHS's marketing

sales, and business as a whole.").

Plaintiffs each purchased a home solar system from PHS. (ECF No. 1, ¶¶ 90-

92). Plaintiffs contend that PHS represented that their systems would reduce

electricity bills between 70% and 90% and they would, in many instances, receive

government rebate checks to cover part or all of the purchase costs. *Id*. at 36.

Plaintiffs allege that they relied on PHS's representations related to "expected

production and functionality" of the systems when making their financed

purchases. *Id*. at ¶¶ 90-92. 93. Yet, after the systems were installed, it became

apparent that the systems were not functioning as they were supposed to. *Id.* at

¶ 93. Plaintiffs' electricity bills were not reduced in any amount near 70-90%, if at

all, and in some instances their electricity bills actually increased. *Id*. at ¶ 94. The

Complaint alleges that Defendants knew that customers' electric bills were not

being reduced by anywhere near the promised numbers, because it had access to

real-time monitoring information about their Systems' production. *Id*. at ¶ 95.

When the Plaintiffs complained to PHS about these issues, they were informed

that the problems were remediable and would be resolved, but the systems could

not be fixed because they were improperly designed and installed. *Id*. at ¶¶ 97-

98.

The Complaint alleges that Trivest and TGIF committed "countless acts of mail and wire fraud" through PHS by causing PHS to send out false, misleading, and fraudulent advertisements, communications, training materials, and instructions through the mail and wires (via internet, telephone and fax). *Id*. at ¶ 72.  The Complaint goes on to describe how PHS, at the direction of Defendant Waller and with the involvement of Trivest and TGIF, posted thousands of misleading advertisements.  *Id.* at ¶¶ 73-79.

## III.   ANALYSIS

### A.   Standard of Review

In deciding a motion to dismiss under Rule 12(b)(6), the court "must construe the complaint in the light most favorable to the [nonmoving party] ... [and] accept all well-pled factual allegations as true*." League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007); *see also Yuhasz v. Brush Wellman, Inc*., 341 F.3d 559, 562 (6th Cir. 2003).  The complaint must provide "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'"  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  Moreover, the complaint must "contain[ ] sufficient factual matter, accepted as true, to state a

claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).

A complaint is subject to dismissal for failure to state a claim if the allegations, taken as true, show the plaintiff is not entitled to relief, such as "when an affirmative defense ... appears on its face." *Jones v. Bock*, 549 U.S. 199, 215 (2007) (quotation marks omitted). A claim has "facial plausibility" when the nonmoving party pleads facts that "allow[ ] the court to draw the reasonable inference that the [moving party] is liable for the misconduct alleged." *Id*. at 678. However, a claim does not have "facial plausibility" when the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Id*. at 679. The factual allegations "must do more than create speculation or suspicion of a legally cognizable cause of action; they must show entitlement to relief." *League of United Latin Am. Citizens*, 500 F.3d at 527. Showing entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).

In evaluating the allegations in the complaint, the court must be mindful of its limited task when presented with a motion to dismiss under Rule 12(b)(6). At

the motion-to-dismiss stage, the court does not consider whether the factual

allegations are probably true; instead, a court must accept the factual allegations

as true, even when skeptical.  *See Twombly*, 550 U.S. at 555 (a court must proceed

"on the assumption that all the allegations in the complaint are true (even if

doubtful in fact)"); *id*. at 556 ("[A] well-pleaded complaint may proceed even if it

strikes a savvy judge that actual proof of the facts alleged is improbable"); *see*

*also Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not

countenance ... dismissals based on a judge's disbelief of a complaint's factual

allegations").  Indeed, in assessing the sufficiency of a complaint, the court must

determine only whether "'the claimant is entitled to offer evidence to support the

claims,' not whether the plaintiff can ultimately prove the facts alleged."  *See*

*United States v. SouthEast Eye Specialists, PLLC*, 570 F. Supp. 3d 561, 574 (M.D.

Tenn. 2021) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002)).

      B.    RICO Claims

          1.    *Does the Complaint State the RICO Claims with Sufficient*
                  *Particularity?*

      Defendants argue that Plaintiffs have not pleaded their RICO claims with

sufficient particularity.  *See e.g.*, *Gotham Print, Inc. v. Am. Speedy Printing Ctrs.,*

*Inc.*, 863 F. Supp. 447, 457-58 (E.D. Mich. 1994) (stating that courts have

"repeatedly held" that predicate acts of mail and wire fraud must be pleaded with

particularity).  A plaintiff must plead the "time, place, subject matter and the

precise individuals who, through the use of the mails or telephone, made the

purportedly fraudulent statements."  *Gotham Print, Inc.*, 863 F. Supp. at 457-58.

This also requires specific allegations "as to which defendant caused what to be

mailed . . . and when and how each mailing . . . furthered the fraudulent scheme."

*Id*. at 458.  Defendants argue that the Complaint contains conclusory allegations

that "Trivest and TGIF[PHI] committed countless acts of mail and wire fraud

through PHS/PE by causing it to send out false, misleading, and fraudulent

advertisements, communications, training materials, and instructions through the

mails and wires (by internet, telephone, and/or fax) as alleged herein."  (ECF No.

1, ¶ 72).  And the subsequent references to mail or wire fraud simply accuse

"Defendants" of committing such acts without differentiating among the

Defendants at all.  *Id*. at ¶¶ 135, 136, 142, 143, 144, 152, 153.  The Complaint also

contains, according to Defendants, only general references to "advertising

materials," *id*. at ¶ 135, and does not actually specify what "advertising material"

was sent, who sent it, when they sent it, or on what advertising material Plaintiffs

may have relied.  Thus, Defendants argue, the Complaint fails to plead any

predicate RICO violation with particularity.

In response, Plaintiffs distill Defendants' argument down to a single sentence: "Defendants assert that Plaintiffs must plead *specific* acts of mail and/or wire fraud *by the moving Defendants* upon which *Plaintiffs actually relied.*" (ECF No. 18, PageID.170).  According to Plaintiffs, RICO does not operate in this fashion.  Plaintiffs contend that Defendants need not have committed any acts of wire or mail fraud themselves, citing *Fenner v. GM, LLC (In re Duramax Diesel Litig.)*, 298 F. Supp. 3d 1037, 1082 (E.D. Mich. 2018).

As explained in *Fenner*, "[w]hen pleading predicate acts of mail or wire fraud, in order to satisfy the heightened pleading requirements of Rule 9(b), a plaintiff must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Heinrich v. Waiting Angels Adoption Servs., Inc*., 668 F.3d 393, 404 (6th Cir. 2012) (quoting *Frank v. Dana Corp*., 547 F.3d 564, 570 (6th Cir. 2008)).

To state a claim based on mail or wire fraud, Plaintiffs must allege the following three elements: "(1) devising or intending to devise a scheme to defraud (or to perform specified fraudulent acts); (2) involving a use of the mails; and (3) for the purpose of executing the scheme or attempting to do so." *Fenner*, 298 F.Supp.3d at 1082 (quoting *United States v. Kennedy*, 714 F.3d 951, 958 (6th

Cir. 2013) (quoting *United States v. Frost*, 125 F.3d 346, 354 (6th Cir. 1997))).  The

plaintiffs must also allege that defendants possessed the "specific intent to

deceive or defraud."  *Id.* (quoting *Frost*, 125 F.3d at 354).  The "scheme to defraud

must involve misrepresentations or omissions reasonably calculated to deceive

persons of ordinary prudence and comprehension."  *Id.* (quoting *Bender v.

Southland Corp.*, 749 F.2d 1205, 1216 (6th Cir. 1984) (citation and quotation

marks omitted)).  While the plaintiffs need not show "actual reliance," they still

must demonstrate that the misrepresentations or omissions were "material."  *Id.*

(quoting *United States v. Daniel*, 329 F.3d 480, 487 (6th Cir. 2003)).  Specific intent

to defraud or deceive exists if "the defendant by material misrepresentations

intends the victim to accept a substantial risk that otherwise would not have been

taken."  *Daniel*, 329 F.3d at 488.

 *Fenner* also explains that "[a] defendant may commit mail fraud even if he

personally has not used the mails."  *Fenner*, 298 F.Supp.3d at 1082 (quoting *Frost*,

125 F.3d at 354).  "A mail fraud conviction requires only a showing that the

defendant acted with knowledge that use of the mails would follow in the

ordinary course of business, or that a reasonable person would have foreseen use

of the mails."  *Id*. (quoting *Frost*, 125 F.3d at 354).  In other words, there is no

requirement that the defendant have actually intended that the mails (or wire) be

used.  *Id*. (citing *Frost*, 125 F.3d at 354).  And, further, "[t]he mailings may be

innocent or even legally necessary."  *Id*. (quoting *Frost*, 125 F.3d at 354) (citation

and quotation marks omitted).  The use of the mails "need only be closely related

to the scheme and reasonably foreseeable as a result of the defendant's actions."

*Id*. (quoting *Frost*, 125 F.3d at 354) (citation and quotation marks omitted).

The facts in *Fenner* bear some resemblance to the present facts.  In *Fenner,*

the plaintiffs filed a complaint against defendants General Motors (GM), and two

Bosch corporate entities.  The plaintiffs alleged that GM represented that its

Duramax diesel engine featured low emissions and high performance, charged a

premium for that engine, and the engine did not actually combine high power and

low emissions as represented.  *Id*. at 1046-47.  The plaintiffs alleged that the

vehicles' promised power, fuel economy, and efficiency was obtained only by

turning off or turning down emissions controls when the software in these

vehicles sensed they were not in an emissions testing environment.  *Id*. at 1047.

According to the complaint, this was achieved by the use of "defeat devices."  *Id.*

The complaint explained that GM did not act alone is developing this scheme.

The Bosch defendants developed and manufactured the "electronic diesel

control" (EDC) device that allowed GM to implement the defeat device.  *Id*. at

1048.  In the amended complaint, the plaintiffs quoted, summarized, or

reproduced approximately ten pages of GM advertising, press releases, and

publications related to the emissions production and fuel economy of its diesel

engines.  *Id*. at 1049.

The Bosch defendants argued that the complaint failed to allege that they

used the mail or wire to defraud.  *Id*. at 1084.  The court rejected this argument

because "a defendant can be found culpable simply by entering into the scheme

to defraud if a co-defendant's use of the mail or wire was reasonably foreseeable

and closely related to the scheme."  *Id.*  More specifically, the court concluded

that the plaintiffs had adequately alleged a number of uses of the mail and wire

that furthered the fraudulent scheme:

> GM submitted applications to government regulators
> which affirmed that the vehicles complied with emission
> standards. Without those mailings and electronic
> communications, GM would have been unable to sell
> the vehicles. The applications and resulting certificates
> also increased the likelihood that consumers would
> perceive the Duramax vehicles as emitting pollution at a
> low level. And although Bosch may not have directly
> used the mail or wire to further the fraudulent scheme,
> GM's uses of the mail and wire were inevitable and thus
> reasonably foreseeable.

*Id*. at 1084.

Here, the Complaint alleges even more direct action by Defendants than by

the Bosch defendants in *Fenner*.  While PHS is primarily alleged to have used the

mail and wire for its fraudulent advertisements, the Complaint also alleges that Defendants were involved in the posting of thousands of misleading advertisements on social media, mostly on Meta's Facebook platform.  (ECF No. 1, at ¶¶ 73-79).[2]  Similarly, while Defendants may not have directly used the mail or wire to further the fraudulent scheme, PHS did so and its uses were the reasonably foreseeable result of Defendants' alleged involvement and participation in the advertising campaign by providing "funding, guidance, and oversight for the campaign."  (ECF No. 1, ¶ 75).  In *Fenner*, the court also did not find the lack of detail regarding the identity of the employee who prepared the mailings or the precise dates of the predicate acts to be fatal.  *Id.* at 1084. Instead, the court concluded that the complaint alleged enough detail to put the defendants on notice of the alleged predicate acts.  *Id.*  Likewise here, the Complaint identifies the post-January 1, 2018 time frame, and offers screenshots of several internet advertisements alleged to be the predicate acts.  (ECF No. 1, ¶¶ 62, 78).  Thus, while it is a close question, the court finds that the Complaint is sufficiently specific under Rule 9(b), Plaintiffs' allegations cross the threshold of plausibility, and dismissal on this basis is denied.

---

[2]  According to the Complaint, PHS filed bankruptcy and in a recent filing, it reported that it owed over $4 million to Meta.  (ECF No. 1, ¶ 74).

Defendants' argument that this case is more like *Kerrigan v. Visalus, Inc.*, 2016 WL 892804 (E.D. Mich. Mar. 9, 2016) is unavailing.  There, the court found that the allegations of mail and wire fraud were insufficient to state a claim because the allegations on which the plaintiff relied did not claim that the defendant "either used the mails or wires on at least two occasions or caused someone else to do so."  *Id*. at *4.  More specifically, while the plaintiff alleged that the defendant appeared in the videos posted on the internet, the complaint failed to plead any facts to support a finding that the defendant *caused* the videos to be published online, *authorized* their publication, or even had knowledge of their publication.  *Id*.  In contrast, the Complaint here alleges that Defendants participated in the management of PHS's marketing, sales, and business (ECF No. 1, ¶ 71), participated in the conception, design, and creation of the advertising campaigns, and provided "guidance and oversight" for the campaign, *id.* at ¶ 75. While again, this is a close question, the court finds these allegations sufficient to nudge the claim over the line of facial plausibility.

### 2.    Do Plaintiffs Lack RICO Standing?

Defendants characterize their next argument as a standing issue, but really, they are asserting a lack of proximate cause, which is not part of the standing analysis.  *See Fenner*, 298 F.Supp.3d at 1053 (quoting *Lexmark Int'l, Inc. v. Static*

*Control Components, Inc*., 572 U.S. 118 (2014) ("Proximate causation is not a requirement of Article III standing.")). More specifically, Defendants argue that the Complaint fails to sufficiently allege that Plaintiffs are persons "injured in [their] business or property by reason of a [RICO] violation." 18 U.S.C. § 1964(c). The language "by reason of" makes proximate cause an essential ingredient of any civil RICO claim. *See Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 267-68 (1992). The "central question" for proximate causation is "whether the alleged violation led directly to plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). "But for" causation is insufficient. *Id*. at 456-57. Defendants argue that Plaintiffs have failed to allege proximate causation here against them. Instead, they suggest that the alleged proximate causes of Plaintiffs' injuries were PHS's misrepresentations made via its advertising campaign, (ECF No. 1, ¶¶ 90-92), not any investment by Trivest or TGIF. Defendants assert that, at most "but for" their investment, PHS might not have been able to make those advertisements, which it argues is insufficient to meet the proximate cause requirement.

Plaintiffs contend that Defendants ask the court to apply the wrong standard by requiring the Complaint to specifically link Defendants' individual predicate acts to Plaintiffs' injuries. Instead, Plaintiffs argue that they have

satisfied the proximate cause requirement by alleging that Defendants entered into a scheme to defraud in which the mail and wires were used, and that Plaintiffs were injured as a proximate result of that scheme.

The court agrees with Plaintiffs.  In *Wallace v. Midwest Financial & Mortg. Serv. Inc.*, 714 F.3d 414, 420 (6th Cir. 2013), the court held that a RICO plaintiff "need only show use of the mail in furtherance of a scheme to defraud and an injury proximately caused by that scheme." *Id.* (quoting *Anza,* 547 U.S. at 649–50).  In *Wallace*, the court explained that there are many ways to establish proximate cause, including whether there is a "direct relation between the injury asserted and the injurious conduct alleged" or whether the plaintiff's injury was a "foreseeable consequence of the conduct alleged." *Id*. at 419 (citations omitted). As discussed above, while Defendants may not have directly used the mail or wire to further the fraudulent scheme, PHS did so and its uses were the reasonably foreseeable result of Defendants' alleged involvement and participation in the advertisement campaign by providing "funding, guidance, and oversight for the campaign." (ECF No. 1, ¶ 75).  Accordingly, the Complaint sufficiently alleges proximate cause.

### 3.   Does the § 1962(a) Claim Fail?

Section 1962(a) makes it "unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise...." 18 U.S.C. § 1962(a).  To state a § 1962(a) claim, a plaintiff must (1) allege when each defendant received income from a pattern of racketeering activity; (2) clearly identify the pattern of racketeering activity from which the income was derived; and (3) plead when each defendant invested funds in the alleged RICO enterprise.  *Kerrigan v. ViSalus, Inc*., 112 F. Supp. 3d 580, 611 (E.D. Mich. 2015).

Defendants argues that Plaintiffs' § 1962(a) claim fails because their only theory of injury under § 1962(a) is that they were harmed because "Defendant PHS/PE used . . . ill-gotten revenues to expand their operations and continue spreading their scheme throughout the United States, while PHS/PE's significantly[-]increased valuation and soaring profits led to substantial financial gain for both Waller personally and Trivest professionally."  (ECF No. 1, ¶ 138). Plaintiffs concede that this claim should be dismissed.  (ECF No. 18, PageID.161, n. 1).  Given Plaintiffs' concession, the motion to dismiss is granted on this claim.

4.     *Does the § 1962(c) Claim Fail?*

To survive a motion to dismiss a RICO claim under § 1962(c), a plaintiff must allege: (1) a defendant's conduct, (2) an enterprise, and (3) a pattern of racketeering activity.  18 U.S.C. § 1962(c); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985) (citing 18 U.S.C. § 1962(c)).  Defendants argue that Plaintiffs' Complaint does not satisfy the enterprise requirement because Plaintiffs allege that all Defendants were at least part owners of PHS/PE.  "An organization cannot join with its own members to undertake regular corporate activity and thereby become an enterprise distinct from itself."  *Begala v. PHC Bank, Ohio Nat'l Ass'n*, 214 F. 3d 776, 781 (6th Cir. 2000).  According to Defendants, a plaintiff cannot satisfy this requirement by alleging a RICO enterprise that "merely consists of a corporate defendant associated with its own employees carrying on the regular affairs of the defendant."  *Manhattan Tele. Corp. v. DialAmerica Mktg., Inc*., 156 F. Supp. 2d 376, 381 (S.D.N.Y. 2001).

Plaintiffs contend that Defendants' argument is contrary to long-established Sixth Circuit precedent.  *See In re ClassicStar Mare Lease Litig*., 727 F.3d 473, 490 (6th Cir. 2013).  In *ClassicStar*, the Sixth Circuit explains the difference between the "person" and the "enterprise" for purposes of § 1962(c):

> The RICO statute makes it unlawful for "any person ... associated with any enterprise ... to conduct or

> participate, directly or indirectly, in the conduct of such
> enterprise's affairs through a pattern of racketeering
> activity." 18 U.S.C. § 1962(c).  A RICO "person" can be
> either an individual or a corporation.  *Id*. § 1961(3).  A
> RICO "'enterprise' includes any individual, partnership,
> corporation, association, or other legal entity, and any
> union or group of individuals associated in fact although
> not a legal entity." *Id*. § 1961(4).  The enterprise itself is
> not liable for RICO violations; rather, the "persons" who
> conduct the affairs of the enterprise through a pattern
> of racketeering activity are liable.  *United States v. Philip
> Morris USA, Inc.*, 566 F.3d 1095, 1111 (D.C. Cir. 2009). To
> establish liability under § 1962(c), a plaintiff "must allege
> and prove the existence of two distinct entities: (1) a
> 'person'; and (2) an 'enterprise' that is not simply the
> same 'person' referred to by a different name." *Cedric
> Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161, 121
> S.Ct. 2087, 150 L.Ed.2d 198 (2001).

*In re ClassicStar*, 727 F.3d at 490.  This principle is known as the "non-identity" or

"distinctness" requirement.  *Id.* (quoting *Begala v. PNC Bank, Ohio, N.A*., 214 F.3d

776, 781 (6th Cir. 2000)).  "Under RICO, a corporation cannot be both the

'enterprise' and the 'person' conducting or participating in the affairs of that

enterprise." *Id*. (quoting *Begala*, 214 F.3d at 781).  As explained in *Begala*, a

corporation may not be liable under § 1962(c) for participating in the affairs of an

enterprise that consists only of its own subdivisions, agents, or members.  *Id*.  This

means that an organization cannot join with its own members to undertake

regular corporate activity and thereby become an enterprise distinct from itself.

*Id*.

Yet, this does not mean that associated corporations cannot form an enterprise.  Indeed, after examining more recent cases from the Supreme Court and the evolution of this theory in this circuit and others, the Sixth Circuit concluded that: "1) individual defendants are always distinct from corporate enterprises because they are legally distinct entities, even when those individuals own the corporations or act only on their behalf; and 2) corporate defendants are distinct from RICO enterprises when they are functionally separate, as when they perform different roles within the enterprise or use their separate legal incorporation to facilitate racketeering activity."  *In re ClassicStar*, 727 F.3d at 492.

Notably, in *ClassicStar*, the alleged RICO enterprise was comprised of "other entities that were neither owned by GeoStar nor acting as its agents."  *Id*. at 493.  Here, while Trivest and TGIF are alleged to have a 25% ownership interest in PHS, they are not wholly owned subsidiaries nor is there an allegation that they acted as agents of PHS.  And given that partial ownership relationship of approximately 25%, it is plain that Trivest and TGIF are functionally separate from PHS.  Thus, the distinctness requirement is satisfied.  Accordingly, the court declines to dismiss the § 1962(c) claim on the basis that the Complaint fails to sufficiently allege the existence of an enterprise.

5.     *Does the § 1962(d) Claim Fail?*

To allege a plausible violation of RICO conspiracy under § 1962(d), a

plaintiff must state facts sufficient to demonstrate all the elements of a RICO

violation and plead the "existence of an illicit agreement to violate the

substantive RICO provision."  *Aces High Coal Sales, Inc. v. Cmty. Bank & Tr. of W.*

*Georgia*, 768 F. App'x 446, 459 (6th Cir. 2019) (citing 18 U.S.C. § 1962(d)).

"Racketeering activity consists of acts which are indictable under a number of

federal statutes listed in 18 U.S.C. § 1961(1)."  *Heinrich v. Waiting Angels*

*Adoption Servs., Inc*., 668 F.3d 393, 404 (6th Cir. 2012).

Defendants argue that this claim fails because Plaintiffs have not pleaded a

cognizable RICO claim and, thus, they cannot proceed on a conspiracy claim.  *See*

*Am. Biocare, Inc. v. Howard & Howard Att'ys, PLLC*, 2016 WL 5661583, *12 (E.D.

Mich. Sept. 30, 2016), aff'd, 702 F. App'x 416 (6th Cir. 2017) (Where Plaintiffs fail

to make a claim for a violation of RICO, they have no claim under § 1962(d)).  As

set forth above, the court has concluded that Plaintiffs' Complaint plausibly

alleges a RICO claim.  Accordingly, the motion to dismiss this claim is denied.

C.     Personal Jurisdiction

Defendants' motion engages in a lengthy analysis applying the traditional

notions of personal jurisdiction and claims that this court does not have personal

jurisdiction over them.  In response, Plaintiffs do not attempt to persuade the

court that it has such traditional personal jurisdiction over Defendants.  Instead, it

points out that the traditional personal jurisdiction analysis does not apply in RICO

cases.  In RICO cases, "[Section] 1965(b) extends personal jurisdiction through

nationwide service of process over 'other parties residing in any other district,' as

long as venue is proper through [Section 1965](a) with that initial defendant and

the 'ends of justice' require it."  *Peters Broad. Eng'g, Inc. v. 24 Capital, LLC*, 40

F.4th 432, 440 (6th Cir. 2022).  Finding jurisdiction over the moving Defendants

only "requires at least one defendant with traditional forum state contacts … such

that any number of defendants from other districts may be joined under

§ 1965(b)."  *Id*. at 441.  Plaintiffs argue that this court has personal jurisdiction

over Defendant Waller, who personally transacted business throughout Michigan

through PHS and this makes venue proper here as well.

In reply, Defendants concede that "RICO jurisdiction may exist over every

defendant if jurisdiction exists over a single defendant."  (ECF No. 20,

PageID.191).  Defendants also do not dispute that this court has personal

jurisdiction over Waller.  But Defendants contend that Plaintiffs cannot satisfy the

"ends of justice" requirement found in § 1965(b) because they have not

adequately pleaded a RICO claim.  *See Prakash v. Altadis U.S.A. Inc.*, 2012 WL

1109918, at *16 (N.D. Ohio Mar. 30, 2012) (citations omitted) (alterations in

original) ("[w]hether a plaintiff can rely on the nationwide service provisions of a

federal statute '[d]epends upon whether [he] has adequately stated a claim' for

violation of that statute.").  Given the court's conclusion above that Plaintiffs'

Complaint plausibly states a RICO claim, Defendants' objection to the application

of § 1965(b) on this basis fails.

Defendants also contend that Plaintiffs must show that no other district can

host the litigation.  Defendants point to *Peters Broadcast* in support of this

argument, but *Peters Broadcast* contains no such holding.  Indeed, the Sixth

Circuit declined to address the parameters of the term "interests of justice."

*Peters Broadcast*, 40 F.4th at 440 n. 4.  Before and after *Peters Broadcast* was

issued, some district courts within this circuit have, however, undertaken such an

analysis, noting a split in the circuits: one circuit found that a RICO plaintiff must

show that there is no other district that would have personal jurisdiction over all

the defendants.  *Doe v. Varsity Brands, LLC*, 2023 WL 4935933 (N.D. Ohio Aug. 2,

2023) (citing *Butcher's Union Local No. 498 v. SDC Inv., Inc*., 788 F.2d 535, 539 (9th

Cir. 1986)).  The Tenth Circuit rejected this notion, concluding that the "'ends of

justice' analysis is not controlled by the fact that all defendants may be amenable

to suit in one forum." *Id*. (quoting *Cory v. Aztec Steel Bldg., Inc*., 468 F.3d 1226,

1232 (10th Cir. 2006)). The *Varsity Brands* case and *Rexam Healthcare Packaging,*

*Inc. v. Osiris Med., Inc.*, No. 3:09-CV-1584, 2010 WL 819063, at *5 (N.D. Ohio Mar.

9, 2010) both adopted the Tenth Circuit's standard, finding its reasoning for

disagreeing with the Ninth Circuit persuasive:

> In so holding, the Tenth Circuit cited persuasive evidence
> that Congress modeled RICO § 1965(b) on antitrust laws
> that "prescribe[d] an 'ends of justice' analysis for
> allowing 'other parties' to be summoned before the
> court, 'whether they reside in the district in which the
> court is held or not.'" *Id*. at 1232 (quoting 15 U.S.C. §§ 5
> (Sherman Act), 10 (Wilson Tariff Act), & 22 (Clayton
> Act)). The Tenth Circuit also noted that it would be
> inconsistent with RICO's purpose of "eradicat[ing]
> organized crime" to force a RICO plaintiff to litigate in an
> inconvenient judicial district "whenever organized
> criminals operate within the same locale and cause harm
> in a distant state." *Id*. at 1232.

*Varsity Brands*, at *15 (quoting *Rexam*, *5). This court agrees with the reasoning

in *Varsity Brands* and *Rexam* and will follow the Tenth Circuit standard. The court

concludes, therefore, that merely because there is a district in which the court

may have personal jurisdiction over all the defendants does not mean that

commencing litigation here necessarily violates the "interests of justice."

Instead, the court looks weighs a number of factors. In *Rexam*, the court

identified several factors that other courts have considered when determining

whether the interests of justice would be served, including: "the desirability of

having the whole action litigated in one court[,] the cost of the delay involved in

transferring the case to another forum[,] and the general balance of hardships

between plaintiff and defendant." *Id*. (cleaned up).  While there may not be a

danger of duplicative actions here given that it appears the entire case could be

litigated in Florida, this case has already been pending since November 2022, and

transferring the matter would cause undue delay.  *See Varsity Brands*, at *17;

*Rexam*, at *5.  Additionally, the inconvenience to Defendants in litigating this

matter here is no greater than the inconvenience to Plaintiffs in litigating this

matter in Florida and the burden on Defendants is minimal, given that they have

competent counsel located in Michigan and "can easily conduct most of their

litigation via electronic means." *Varsity Brands*, at *17; *see also*, *Rexam*, at *5-6.

On balance, the interests of justice factors weigh in favor of retaining the

litigation here.  Accordingly, the court denies the motion to dismiss on the alleged

lack of personal jurisdiction.

     D.    <u>MCPA</u>

        *1.    Economic loss doctrine*

Defendants maintain that Plaintiffs' MCPA claim is barred by the economic

loss doctrine.  The economic loss doctrine provides that "[w]here a purchaser's

expectations in a sale are frustrated because the product he bought is not

working properly, his remedy is said to be in contract alone, for he has suffered

only economic losses." *Neibarger v. Universal Cooperatives, Inc.*, 439 Mich. 512,

520 (1992) (internal quotation marks omitted).  It applies to "transactions

involving the sale of goods for commercial purposes where economic

expectations are protected by commercial and contract law, and those involving

the sale of defective products to individual consumers who are injured in a

manner which has traditionally been remedied by resort to the law of torts." *Id*.

Defendants claim that the economic loss doctrine bars claims under the MCPA,

citing a footnote in *Murphy v. The Proctor & Gamble Co*., 695 F. Supp. 2d 600, 606

n.3 (E.D. Mich. 2010) ("The underlying rationale of the economic loss doctrine is

applicable to claims under the Consumer Protection Act.").[3]  A competing

footnote in a Michigan Court of Appeals case suggests otherwise:

> The other ground [cited by the trial court] for dismissing
> the MCPA claims was that they were barred by the
> economic loss doctrine.  We conclude that this was error
> as well because the economic loss doctrine only applies
> to tort claims (e.g., product liability claims) arising from
> a sale.  *Quest Diagnostics, Inc v. MCI WorldCom, Inc*, 254
> Mich. App 372, 380; 656 NW2d 858 (2002). Therefore,

---

[3] The case on which the court relies for the proposition that the economic loss doctrine bars MCPA claims – *Williams v. Scottrade, Inc*., 2006 WL 2077588, *7 (E.D. Mich. July 24, 2006) – does not so hold.  Instead, the *Williams* court found that the plaintiff's fraud-based claims (which included the MCPA claim) were not sufficiently pleaded with particularly under Rule 9(b).  *Id*.  The court found that the economic loss doctrine only barred the unintentional tortious conduct.  *Id*. at *5-6.

> we conclude that the trial court erred in granting
> defendant summary disposition on these grounds.

*Prose v. Sun & Ski Marina*, No. 245823, 2004 WL 2827197, at *5 (Mich. Ct. App.

Dec. 9, 2004).  Other courts have concluded that analogous claims under other

statutory consumer protection schemes were not barred by the economic loss

doctrine.  *See e.g.*, *Kantor v. Hiko Energy, LLC*, 100 F. Supp. 3d 421, 427 (E.D. Pa.

2015) (Noting that state intermediary court held that the economic loss doctrine

did not bar statutory fraud claims brought pursuant to the Pennsylvania Unfair

Trade Practices and Consumer Protection Act) (citing *Knight v. Springfield*

*Hyundai*, 81 A.3d 940, 952 (Pa. Super. 2013)); *Tungate v. Volvo Trucks of N. Am.*,

LLC, 2009 WL 4249200, at *2 (M.D. Tenn. Nov. 24, 2009) (holding that

Tennessee's economic loss doctrine does not preclude a Tennessee Consumer

Protection Act claim involving the sale of goods).  It makes little sense to suggest

that the economic loss doctrine bars claims under the MCPA as applied to the sale

of goods because the MCPA itself specifically applies to goods.  *See e.g.*, Mich.

Comp. Laws § 445.903(1)(a)-(h); (k)-(l), (r), (hh).  Were this the case, the exception

found in the economic loss doctrine would swallow the statute.

Finally, the transactions here involved the sale of goods along with design

and installation services, which Plaintiffs argue preclude application of the

economic loss doctrine.  (*See* ECF No. 1, ¶ 3) ("These Systems would be

"designed" and installed by poorly trained, unqualified and unlicensed

technicians, all but ensuring that the systems would not perform at even a

significant fraction of what the company's agents represented."); ¶ 30 ("PHS not

only did not require NABCEP certification of its design and installation employees,

it disregarded the necessary training and certification entirely – in favor of

minimal two day training programs designed by Defendant Waller."); ¶ 31 ("PHS

sent poorly trained salespeople into potential customers' homes in the role of

designers, purportedly aided minimally by an offsite 'design team,' (which would

nearly instantly provide 'plans' for solar installations) and utilized completely

unqualified installers, ensuring that no qualified person ever laid eyes on a

customer's home or hands on their system."); ¶ 53 ("PHS's business model

completely ignored the proper design, arrangement, and installation of the

Systems purchased by Plaintiffs and the Class, meaning that contrary to its

promises to save customers money, it was burdening them with expensive, ill-

functioning Systems instead.").  Michigan's economic loss "doctrine is associated

with 'transactions in goods,' not with transactions in services." *Cargill, Inc. v.

Boag Cold Storage Warehouse*, 71 F.3d 545, 550 (6th Cir. 1995) (citations

omitted).

Michigan courts apply the predominant factor test to determine whether a contract primarily involves the sale of goods or the sale of services, which asks whether the primary purpose of the contract is for the sale of goods or the provision of services. *DaimlerChrysler Corp. v. Wesco Distribution*, 281 Mich. App. 240, 245 (2008).  Generally, the question whether goods or services predominate in a hybrid contract is one of fact.  *Frommert v. Bobson Const. Co*., 219 Mich. App. 735, 738 (1996) (citing *Higgins v. Lauritzen*, 209 Mich. App. 266, 269 (1995)).  The court cannot determine, in the context of this motion to dismiss, whether good or services predominate the transactions at issue.  *See Frommert*, 219 Mich. App. at 738 ("Where there is no genuine issue of any material fact regarding the provision of the contract, a court may decide the issue as a matter of law.").  For all these reasons, the motion to dismiss the MCPA claim based on the economic loss doctrine is denied.

### 2. *Safe harbor provision*

Defendants also argue that the MCPA's safe harbor provision bars the MCPA claim.  Under the MCPA, "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce are unlawful ...."  Mich. Comp. Laws § 445.903(1).  The MCPA contains an exemption found in § 4(1)(a) that exempts any "transaction or conduct specifically authorized under laws

administered by a regulatory board or officer acting under statutory authority of this state or the United States."  Mich. Comp. Laws § 445.904(1)(a).  The party claiming the exemption bears the burden of proving its applicability.  *Liss v. Lewiston-Richards, Inc*., 478 Mich. 203, 208 (2007).

In *Liss*, the court explained that, applying the test from *Smith v. Globe Life Ins. Co*., 460 Mich. 446 (1999), the relevant inquiry "is whether the general transaction is specifically authorized by law, regardless of whether the specific misconduct alleged is prohibited."  *Liss*, 478 Mich. at 212 (quoting *Smith*, 460 Mich. at 465).  The Michigan Supreme Court also construed the meaning of "specifically authorized" under the MCPA.  *Id*.  "Specific" means "having a special application, bearing, or reference; explicit or definite."  *Id*. (citation omitted).  "Authorize" means "to give authority or formal permission for; sanction."  *Id*. at 212-213 (citation omitted).  Thus, the court concluded that the exception "requires a general transaction that is explicitly sanctioned."  *Id*. at 213 (citation and quotation marks omitted).  In *Liss*, the conduct at issue was residential home building.  The court noted that builders are licensed under the Michigan Occupational Code and are regulated by the Contractors' Board, which oversees licensing and handles complaints.  The court further points out that there was a set of administrative rules promulgated to regulate the licensing procedure.  *Id*. at

213.  Based on the statutory definition of residential home builder as one who engages in construction activities for compensation, the court found that a residential home builder was "specifically authorized" to contract to build homes. *Id*.

Here, Defendants' analysis is not tethered to *Liss*.  They maintain that, because energy and solar systems are "subject to regulation in Michigan" and because the use of renewable energy is authorized by law, then the safe harbor provision applies.  Yet, they cite two tax statutes, the renewable energy credit statute, and generally point to the statute governing public utilities in support of their argument.  This argument does not sufficiently explore the analysis contemplated by *Liss* or *Smith*.  Defendants do not identify a regulatory board or officer overseeing PHS's conduct and nothing in Defendants' argument suggests that there is a Michigan regulatory scheme that "specifically authorizes" the sale of solar systems as described in the Complaint.  The court concludes that Defendants have not met their burden of establishing that the exemption applies.

E.   Necessary Parties

Lastly, Defendants argue that the court should dismiss the Complaint under Rule 12(b)(7) because Plaintiffs have failed to join an indispensable party – PHS – under Rule 19.  A party is necessary if,

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may; (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1). They argue that PHS is a necessary party because it is central to all the allegations in the Complaint and the Complaint alleges that Defendants acted in concert with PHS. Defendants offer the quintessential description of a joint tortfeasor. And "[i]t has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit." *Temple v. Synthes Corp*., 498 U.S. 5, 7 (1990). As the Supreme Court further observed, nothing in Rule 19 changes that principle. *Id.* Indeed, the Advisory Committee Notes to Rule 19(a) explicitly state that "a tortfeasor with the usual 'joint-and-several' liability is merely a permissive party to an action against another with like liability." *Id.* (quoting 28 U.S.C. App., p. 595). Defendants protest that moving forward without PHS creates a significant risk of parallel litigation and inconsistent relief. But they fail to explain how that risk differs in this case as opposed to any other case where not all joint tort-feasors are joined

in the same litigation, which is clearly not sufficient to meet the "indispensable party" standard set forth in Rule 19.

## IV.    CONCLUSION

For the reasons set forth above, the court **DENIES** the motion to dismiss in its entirety, except that Plaintiffs' claim under § 1962(a) is **DISMISSED**.

**SO ORDERED**.

Date: September 12, 2023                    s/F. Kay Behm
                                            F. Kay Behm
                                            United States District Judge